## Rickard *v.* Rickard.

### Divorce—Evidence—Adultery.

Where adultery between parties closely related in blood is charged as a ground for divorce, the proof ought to be clear and convincing, and not rest in mere inferences from equivocal circumstances.

Appeal from Benton.

*R. S. Strahan, Wm. R. Willis and J. W. Rayburn,* for appellant.

*John Kelsay, John Burnett and N. B. Knight,* for respondent.

By the Court, Watson, J.:

The appellant brought this suit for a divorce, in the circuit court for Benton county, upon the grounds:

*First*—Cruel and inhuman treatment and personal indignities, rendering her life burdensome.

*Second*—Adultery by respondent with one Mary Meats.

The answer denied both these charges, and the court below, on the evidence, entered a decree for the respondent. The appeal is from this decree.

The parties to the suit were married in Benton county, November 21, 1871, and lived together there, as husband and wife, until June 2, 1879, when appellant went to the house of

her parents, some twelve miles distant, and has remained there ever since.

Three children were the issue of this marriage—one girl and two boys. The girl is dead. The boys are both living, named Bay and Ray, aged respectively six and four years.

Mary Meats is respondent's half-sister. He is forty-nine, and she is some ten years younger. He brought her and her sister out with him from Illinois, in the fall of 1866, and she lived with him and kept house for him from that time until his marriage with the appellant. About a week after his marriage, Miss Meats went away, and was absent for several months, when he brought her back, and she has remained at his house ever since. During this period she seems to have been engaged in the work about the house and farm, and in taking care of the children. The valuable character of her services during this long period cannot be denied.

During the earlier and much greater portion of this period, Mr. and Mrs. Rickard seem to have lived together as agreeably and with as little domestic infelicity as ordinarily falls to the married lot. It is true she testifies that he ceased to love her soon after their marriage; became sullen and morose in her society, and in 1876 struck her once, on the shoulder, while in a fit of anger.

But her subsequent conduct, we think, fully justifies the inference that none of these matters created any deep or annoying impression in her mind—most certainly not to the extent of rendering her life burdensome, or raising apprehensions for her future security. Nor do we think these observations of hers upon his general demeanor toward her, or this isolated act of physical violence, if it actually occurred as she has testified, followed as they were by years of peaceful, and, to all external appearances, congenial domestic intercourse, and in no manner connected with their after differences, can have any weight in the final decision of this case.

In any possible view that can be taken of the evidence; it is apparent that the unfortunate misunderstandings between

these parties, which have resulted in their hopeless estrangement and final separation, had their origin in Mrs. Rickard's deep distrust and bitter aversion for Mary Meats. Whether guilty or innocent, Mary Meats was at the bottom of the trouble. In substance, the evidence offered, which we deem of vital importance, is as follows:

Laura Rickard, the appellant, testifies to her husband's habitual indifference and neglect towards herself, and his constant attention and deference to Mary Meats. That the latter left their house about a week after their marriage, and remained absent for several months, when the respondent brought her back. That afterwards, when the subject of her remaining with them came up, she told him she wanted him to send her (Mary Meats) back to the States to her sister. He refused to do so, and she said no more. This was in 1876. That after he brought her back to their home, he would pull her down on his lap; put his arms around her waist; sometimes lay his hands on her breasts; romp with her; sometimes bite her, when she would refuse to go to bed; sometimes they would go to bed at the same time, and witness would hear her laughing and telling him to quit; and one time witness was sitting in the sitting room, adjoining the bedroom, undressing the children, and after undressing one of them, she went to the door of the bedroom and saw him lying down on the bed, over on Mary Meats; he saw witness and went to bed. That he was in the habit of taking Mary Meats with him when going out to work on the place where they lived, or other places belonging to him, in the neighborhood, and remaining away with her all day. That about the middle of April, 1879, she went to bed early one night, and left Mary Meats and her husband sitting up together. In about half an hour Mary Meats came in and went to bed, her bed being in the same room. A half hour later her husband came into the room, blew the light out and got into bed with Mary Meats, and stayed there about half an hour, when he came to bed with witness. Witness said nothing, for the reason that she

was afraid.    She heard " not a great deal of noise; about like
a person getting into bed." She says, in answer to cross-ques-
tion 2163, "Did you hear any noise in any manner, in the
bed, after they retired, or any whispering?" that she did
not approve of their conduct, but thought it best to wait, say
nothing, and see what they would finally do.

It is certain, from all the testimony, that she made no open
charge of undue intimacy between her husband and Mary
Meats until May 24, 1879.    She was quite ill from the 18th
of May up to the time she went to her father's house, June
2d, and remained so for three or four weeks after that date.

Abigail Calloway, appellant's mother, testifies that she was
sent for, about the middle of May, to come and see her
daughter, on account of her sickness, and went and attended
upon her two days and nights, and then returned home.    She
was called back to her daughter's house two days afterwards,
and remained there, attending upon her and nursing her, until
June 2d, when her daughter went home with her; that while
she was there she discovered that the respondent was sleeping
in the same bed room where Mary Meats slept—a different
room from where his wife was sleeping.    That she went into the
room where they slept, one morning, and saw him in bed and
Mary Meats dressing herself beside the bed; that she only
saw the one bed in that room; that when she was there the
first time, he slept in the same bed with his wife, and Mary
Meats occupied a bed in the same room.    Some time after
she went there, the second time, Mary Meats took the two
children and went into a different bedroom to sleep.    Rickard
then slept several nights in the bed that Mary Meats had
previously occupied, in the same bedroom where his wife
slept; then he moved out of that room and went and slept
two or three nights in the same room that Mary Meats occu-
pied with the children.

W. R. Calloway, appellant's father, testifies that he was at
his daughter's house on several occasions during her illness in
May and June, 1879, and that two nights while he was there,

the respondent slept in the same bedroom where Mary Meats slept, while his wife was lying sick in a different room; that he knew this from seeing respondent pass in and out of the bed room night and morning, and from hearing respondent, Mary Meats and the children talking in there, after they had gone to bed; that respondent neglected his wife during her sickness, and did not show her the attention, or make the provision for her comfort, he should have done.

Annie Brown testifies that she stayed at the house two nights during appellant's sickness, in May, 1879; heard respondent, Mary Meats, and the children talking in their bedroom about bed time, and saw him pass in and out of this bedroom night and morning; that there was only one bed, and a pallet spread upon the floor, in this room.

Lillie Taylor, sister of the appellant, aged nineteen, in April, 1879, testifies that she staid at appellant's house one night about 1875; slept in the same bed with Mary Meats, which was in the same bedroom where appellant and respondent slept, in another bed; that about twelve o'clock at night the respondent got up out of his own bed, came over to the bed where witness and Mary Meats were sleeping, and put his hands under the quilts; witness turned over and respondent went back again to his own bed.

J. G. Wygall testifies that he was at their house about New Year's, 1877, and stayed all night; got up in the morning and went into the sitting room; heard one of the children making a fuss in the adjoining bedroom; opened the door and looked in, to see what was the matter; saw two persons lying in the bed together, and pulled the door to and went away. Appellant was in the kitchen at the time, and witness had not then seen either respondent or Mary Meats about that morning, and believes that they were the persons he saw lying in the bed together.

Emma Smith, another sister of appellant, testifies that she was at the latter's house in September, 1879, on Sabbath day; that she and the appellant had been sitting during the after-

noon out in the shade of the house; that when it was time to go home, she went into the sitting room to get her bonnet, and as she passed the bedroom door, saw the respondent and Mary Meats lying on the bed together.

There is an abundance of testimony to show that all three of the parties most interested in the result of this case, are esteemed to be highly respectable in the community in which they live.

The respondent and Mary Meats both, in their testimony, positively contradict the appellant and her witnesses, on every material point in their testimony.

The counsel for appellant contends for two propositions: First, that the evidence established the charge of adultery. Second, that even though the charge of adultery has not been proved, still the respondent's conduct with Mary Meats, in his own house, of which his wife was cognizant, taken in connection with his neglect of his wife's comfort and happiness, and his refusal to send Mary Meats away, when his wife made known to him her deep distrust and intolerable dislike for her, constitutes a case of cruel and inhuman treatment, and personal indignities, rendering life burdensome, under the provisions of our statutes on that subject.

In determining each of these issues, the conceded fact that the respondent and Mary Meats are brother and sister of the half-blood—children of the same mother—should never be lost sight of. Blood relationship, in so near a degree, justly disarms suspicion and avoids any criminating inference from familiarities however strange or unusual, but which do not unmistakably impart guilt.

If he was guilty of this great crime with his half sister, the proof upon which the court is asked to find that fact ought to be clear and convincing, and cannot be made out by circumstances which the close relationship of the parties renders equivocal.

After making such allowances as we deem proper, on account of the great interest which the principal witnesses on

either side have in the result, and their honest mistakes or imperfect recollections, we are compelled to say that the charge of adultery has not been established by the evidence.

It is not difficult to perceive how Mrs. Rickard might have been mistaken about her husband coming into the bedroom, blowing out the light, and then getting into bed with his half sister. The beds were in the same room, one on either side of the door that led into it from the sitting room, and not more than four or five feet apart, but little more than the width of the door. She testifies that her husband did, after blowing out the light, get into bed with Mary Meats, but does not say she saw him do so; also, that it was light enough in the room, after the candle was blown out, to see the bed where Mary Meats slept, but not that she did see it. And her testimony, that all the noise she heard " was about like a person getting into bed," would indicate very strongly that her conclusions were drawn from what she heard and not from what she saw. She admits that she was jealous of her husband and Mary Meats before this happened, and hence, no doubt, the merest trifle was sufficient to awaken her suspicion. But her own conduct towards both these parties, then and afterwards, shows conclusively, we think, that however jealous and distrustful she may have been, she was not satisfied of their guilt, as she must inevitably have been if she had seen what she testifies did actually occur. She made no complaint to any one, uttered no word of remonstrance to either of the offending parties; gave no sign of terrible mental agony, which must inevitably have followed the conviction that she had been the victim of such an outrageous and intolerable wrong; but went right along until the 24th of the following May, just as though nothing had happened to disturb her peace or mar her happiness.

If the transaction itself were not so unreasonable and so extremely improbable, her subsequent conduct alone would stamp it as a mere jealous fancy, which she herself had no real confidence in until long afterwards, when sick, feverish,

and confined to her bed, and her old feeling of jealousy inflamed to a still higher pitch, in all reasonable probability, by the impressions of those around her, her fierce suspicions at last found utterance. That there is still even greater probability of mistaken impressions, in the testimony of her sister, Lillie Taylor, will hardly be controverted. The transaction to which she testifies occurred over four years previous to the date of testifying to it, and when she was only thirteen or fourteen years old. The beds were, as we have already seen, in the same room, and with only a narrow passage to the door between them. How she knows the respondent put his hands under the quilts and touched Mary Meats she does not explain. She was awake, but he did not touch her, so far as her testimony shows. It was midnight, in the winter season, and the respondent, in groping along the narrow passage between the two beds, to or from the door, in the darkness, may have jostled against the bed where witness was lying, or placed his hand upon it, thus giving the witness the impression she has testified to. Her statement that he put his hands under the quilts and touched Mary Meats, at midnight, without stating any means of knowledge, cannot be treated as anything more than a groundless surmise on her part, and as entitled to no weight whatever.

J. G. Wygall's testimony is of the same character. He saw two persons in bed, and from that and other facts, comes to the conclusion that these two persons were the respondent and Mary Meats. But he does not pretend to identify them from what he saw, and gives not a single fact tending to identify them as the persons he saw in bed together. Virtually he draws his conclusion from seeing two persons in bed together—knowing that Mrs. Rickard was out in the kitchen at the same time, and not having seen either Rickard or Mary Meats around, while he also knew they were about the house somewhere, as well as the two children. Not having attempted to describe or identify the two persons he saw in bed together, they might have been and probably were either the two boys,

or Rickard or Mary Meats with one of the boys; but there is no reasonable probability whatever that they were Rickard and Mary Meats.

This testimony is without any weight whatever in our view of it, and hardly deserving of such extensive comment. It is enough to say, generally, in regard to the rest of the testimony on behalf of the appellant, that it discloses no fact or circumstance tending, in our judgment, to establish the charge of adultery.

The respondent's unconcealed affection for his half sister, his attention to her comfort, his deference to her wishes, the frank and open familiarity which marked his conduct toward her, and even his sleeping in the same room where she slept with the children during a portion of the time his wife was confined to her bed, in another room, there being two beds in the room where he and his half sister slept, are each and all entirely reconcilable with his entire innocence, and justify no inference to the contrary.

There is another feature of the conduct of respondent towards Mary Meats which, in our judgment, tends strongly to negative the existence of any criminal relation between them. There is nothing in the evidence even tending to show that they ever made any attempt at secresy or concealment. This is unlike adultery, which has always been recognized as peculiarly "a crime of secrecy and darkness." But we look in vain through the testimony in this case for any such criminating indications. The doors are always open; there is no precaution against detection and exposure, and no embarrassment or confusion following on discovery. If they are guilty their case is without a parallel within the scope of our investigations.

But we deem it entirely unnecessary to pursue this proposition further, and turn our attention to the other. Conceding that if the respondent's conduct, in connection with Mary Meats, had been of such a character as to justify his wife's inference of the existence of criminal relations between them,

carried on in her own house, and he should persist in such a course against her remonstrances, and refuse to send Mary Meats away, with knowledge of his wife's distrust and mental suffering, occasioned by such conduct, it would have constituted a case of cruel and inhuman treatment and personal indignities rendering life burdensome, under our statute, even though no guilt existed in fact. The fact of actual guilt could not add to the intensity of her mental suffering, occasioned by a full belief, on sufficient grounds, in its reality. And if he knowingly induced such a belief, with its consequent mental suffering, in his wife, he should be held responsible. Still the testimony produced by appellant does not make out such a case, as we have already seen, in examining it upon the first proposition. Her suspicions were not justified by any phase of her husband's conduct with Mary Meats. They did not perceptibly affect her own conduct toward either of these parties, until long after she had full knowledge of all the facts upon which they rested. Her husband was not even cognizant of their existence in her mind, until the 24th of May, 1879, when she openly charged him with living with Mary Meats as a wife, and demanded that the latter should be sent away, as the only condition upon which she herself would remain in his house.

Granting that Mrs. Rickard was sincere in her belief in her husband's guilt, but that her belief was mistaken and groundless, and that his conduct was not only innocent in reality, but also free from such grave improprieties as would justify her suspicions, we see no reason to hold him responsible for the unhappy consequences of her mistaken judgment. His refusal to turn his half sister out of his house, after such a charge had been openly preferred against her in connection with his own name, was plainly justifiable. Indeed he could not have done otherwise, without in some measure sanctioning the truth of that charge, and subjecting both himself and her to unmerited reproach and public shame. We are satisfied that the respondent only did what was clearly his duty to

do under the circumstances, and that the appellant had no cause to complain.

The decree of the court below is affirmed, with costs.

Decree affirmed.